Chief Justice Robertson,
dissenting from the majority of the court, delivered his own opinion as follows ;
I did not concur in the former opinion delivered in this case, because it was my opinion, that the bond was legal and should be enforced. I *654 believed that the jailor had a rigid to take the bond, and.I thought that there was nothing illegal in its condition. My opinion remains unchanged.
The authority of the jailor to take the bond being now conceded, no argument is necessary to support it.
But it is said, that the bond is void, because, as argued, there was no law of the United States enlarging the prison bounds to the limits of the statec This I cannot admit.

This .argument was'not touched until the re-argument-.

By the first section of an act of congress of 1800,-it is declared, “that persons imprisoned on process issuing from any court of the United States, shall be entitled to like privileges of the yards or limits of the respective jails as persons confined, in like cases, on process from the respective courts of the states are entitled to, and under the like regulations and restrictions.”
Prison bounds, “yards” or “limits” are, in legal contemplation, an extension of the walls of the jail.— Stierman et al. vs. Tabb et al. III Bibb, 202.
In 1821, the capias ad satisfaciendum was abolished by the legislature of this state. And by an act of 1822, our legislature expanded the prison bounds to the limits of the state. The foregoing act of congress had not been repealed when the bond, I am now considering, was executed conformably to the act of 1822 of this state.
It is my opinion, that the act of congress, which has been quoted, is prospective in its operation, and therefore adopts the Kentucky statute of 1822. I do not doubt the power of congress to impart to such an act such capacity and application. It is not necessary now to discuss the power of congress to delegate its legislative authority. But that congress may, by the exercise of its legislative function, communicate power which is, in effect, legislative, cannot be denied. Illustrations are deemed superfluous.
Every court possesses an inherent power to enforce its own judgments ; and, unless restricted by legislation, has, necessarily, a right to regulate its *655 own process. If, therefore, congress had passed an act declaring that the courts of tire United States might adopt and regulate their own inodes of enforcing their own mandates, the validity of such an act could not have been questioned, even though it had been considered an act delegating legislative power.
If the act of 1800 be, as I suppose, prospective, it should not be deemed a delegation of legislative power, by congress, to the state legislatures. It only prescribes to the federal courts such rules as the states shall prescribe to the state courts. If congress had power to allow the federal courts to adopt rules for enforcing their own judgments, it certainly had power to authorize them to adopt the rules which had been or should be prescribed to the state courts by the legislatures of the respective states; and, of course, it had power to declare that the rules which the states should, from time to time, establish should be the rules of the federal courts.
But argument on this subject is superseded by authority. In Wayman vs. Southard, X Wheaton, 1, and in the Bank of the United States vs. Halstead, Ib. 51, the supreme court of the United States decided that congress has power to “ delegate” to the federal courts the right to modify their own process and rules of proceeding, and also has power to adopt, prospectively — as they may be established by the state legislatures — the process and rules of the state courts. These decisions are authoritative in this case, and in all similar cases, in this court; and even if they were not as reasonable as they are authoritative, I could not feel at liberty to question or' disregard them.
There is nothing in the first section of the act of 1800 inconsistent with the prospective interpretation which I think it should receive, and that interpretation is not only authorized by the letter of the act, but is fortified by its policy arid by the ianguage used in the acts of 1789 and 1792, and the uniform construction of some of the provisions of those acts.
The great object of the federal constitution was to establish and preserve the union of the states. In jit» *656 legislative function the general government is national ; its laws operate directly on the citizen, who is also subject to the legislative action of his own state. Nothing can be more essential to union than harmony in the action of the federal and state governments on the individual rights of the citizen, in the administration of law through the instrumentality of courts of justice.
Where the process law of the general government is more rigorous or summary than that of the state government, such a discordance and disparity in the operations of the two governments may tend to generate a correspondent feeling of jealousy and alienation, and create a disposition to consider federal authority as irksome and foreign. But when the citizen is treated alike by both governments, and especially when the judicial process of each is the same or similar, he has every motive to cherish the same affection for each, and to consider both as equally his, and alike necessary to his welfare. Moreover, uniformity in the administration of the laws, as far as may be consistent with justice, is recommended by habit and convenience. Hence it is, and ever has been, the policy of the general government to conform, in a great degree, to the process laws of the states ; and the general practice has corresponded with that policy.
Hence I am the more strongly inclined not to give ■a restrictive construction to the act of congress of 1800 ; but, by liberally construing it according to its object as well as tenor, to consider it as adopting, for the federal courts in each state, the prison rules as they should be modified, from time to time, by state authority. Besides, as the prison rules of the several states were materially different at the date of the act of 1800, it is evident that congress could have been influenced by one consideration only in adopting them, as they wore, with all their discrepancies, and that is, a sense of the fitness of uniformity, in that particular at least, in- the action of the federal and state judiciaries. The same motive would have prompted the adoption, prospectively, of the prison rules in each state as modified, and whenever modified by each ; otherwise the incon* *657 gruity, which the act of 1800 was intended to prevent, would have soon and certainly resulted, and thus the chief purpose of thciT act would have been frustrated.
The process-acts of 1789 and of 1792, adopted the state process as it then was in each state. Each of those acts contains the words — “asnow used” — in the state courts : and that was the reason why each was restricted by the supreme court to the process of each state as it was at the date of the act. See U. S. Bank vs. Halstead, (supra.) But the act of 1800 omitted the words — “as now used” — and contains nothing of the same or Ihe import. And I must infer, that congress had some motive for dropping those words when the statute of 1800 was enacted ; and that was, as I suppose, a desire to. adopt the prison rules of the respective states.as they might happen to be at any time afterwards, until altered by act. of congress.
The 34th section of the judiciary act of 1789 declares that, “ the laws of the several states, except where the eonstiulion, treaties or statutes of the U. States shall otherwise require or provide, shall be regarded as rules of decision in trials at common law in the courts of the United States in cases where they apply.”
That section has always been construed to be prospective in its operation, and to embrace state “ rules” as they should arise. See the cases already referred to in X Wheaton. The uniform construction of the 34th section of the act of 1789. fortifies the interpretation I have given to the act of 1S00 ; for the language of each is substantially the. same. It does more. It. shews that, in relation to some subjects about which congress may legislate, it may so legislate as to adopt, prospectively, the legislation of the states. Unless such prospective .legislation, 'as to process, be effectual, land would not have been subject to sale :under an execution from a federal court in {his state ; because, in 1792, when the last process act was pñsséd By congress, and which adopted the state process laws, land was not liable to execution in Kentucky.
*658 Other considerations might be urged. It Was known that the prison bounds, as existing in the several states in 1800, were liahleto extension and material modification, and even to abolition, by state authority. It cannot be presumed to have been the intention of congress to retain thorn, as they were in 1800, unless -they should remain the same under state authority.
If a state, having prison bounds in 1800, had abolished them in 1801, I cannot helieve that the national legislature intended that, though abolished, they should still be allowed under process from a federal court; or if a state having no prison bounds in 1800, bad prescribed bounds in 1801,1 cannot admit that, under the act of 1800, there would have been no prison rules for a federal court in such state. In a state which bad altered its prison rules since 1800, it would be difficult for a ministerial officer afterwards to identify the limits which had been abolished and disused ; and inconvenience, uncertainty and confusion would result from an adherence to them by the federal government. And why should not the substituted bounds be observed Under federal as well as state process ? The original limits had been adopted because they ivere the rules for stale process, and for no other reason. The substituted rules are recommended by the samecontroling consideration. But, as already suggested, the prison rules are but an extension of the prison walls', and, as the general government uses the jails of the States, it would be unreasonable, to suppose that the act of 1800 intended that they should be used in any other wav than the states should prescribe, that is, with the walls, legal as well as actual, as defined and constructed by the states at the time when used. — - And this and nothing else is imported by the letter of the of the act of 1800. It declares that persons Imprisoned under federal process shall be entitled to the same privileges as persons confined under state process are entitled to, that is, as persons confined under state process are entitled to at the same time, or when the federal prisoner is in custody. The state and federal prisoners shall be entitled, at the same time, rt to the same privileges,” and shall be subject to *659 the “same rules and regulationsIn my opinion, such are the letter an.d spirit of the 1st section of the act of 1800; and if I had doubts on this subject, I should not be inclined to give such a construction to the section as would make useless and invidious discriminations between citizens of the same commonwealth supporting and supported by the same institutions. Before 1 would cometo such a conclusion, on, such a subject, I would require a clear and distinct expression of legislative will to sustain me. But that will, as I understand it, is plainly jrreconcileable with such a conclusion. The act of'1800-adopted the state prisons, not as they then were, but as they should be, and wherever they might happep to fye situated at any future period. So far the act-was not only contingent and prospective in its application, hut might (with as much propriety in this respect as it could be in relation to the prison-rules), be deemed a delegation of power to the legislatures- or county courts of the states to erect, preserve, regulate and even change the scites of jails for the Unit-ted States. But it was only a declaration to the fecf-eral courts of the will of congress that they should use the state jails under state regulations.
If, in a particular state, the prison walls should, In consequence of state regulation, be, in legal contemplation and effect, coterminous with the boundaries of the counties in which they are placed, those prisons, with those legal bounds, are the “ prisons'1 ’ of the general government, with the consent of the state. And, therefore, the prison bounds, as prescribed by the act of 18JJ2 of the Kentucky legislature, were the prison bounds of the general government until altered by the authority nf the one or the other government.
But it is said that, at the date.of the bond, no citizen could have been lawfully imprisoned in this state for debt in consequence of any judgment or decree of a. state court, and that, therefore, the act of 1800 did not authorize the jailor to allow to Hanna the limits of Kentucky as prison bounds, and, consequently,- the bond was illegal and void,
I do not admit either the postulate or the conclusion, as thus stated.
*660 It is my opinion, that a citizen who had been (since the abolition of the ca. sa.) imprisoned for failing to sive special bail, and had been confined until after judgment against him, might have been retained in custody until lie either satisfied the judgment, or took the oath of an insolvent debtor. There is nothing in tho provisions of the act of 1821, abolishing the ca. sa., inconsistent with such an opinion ; and it seems to me that any other opinion would render so much of the act as allows a creditor to require special bail, incongruous and nugatory. The act declares only that a capias ad satisfaciendum shall not be issued. It certainly does not even intimate that a person imprisoned for failing to give special bail (when legally required) shall be liberated by the obtainment of a judgment against him. If this view'bo correct, the bond cannot he illegal. But even if it be incorrect, still,’ l think, the bond is valid and legal.
Congress had not abolished the ca. sa. or enacted any process law adopting, prospectively, state laws regulating the process of state courts Then it was lawful to imprison Hanna upon a ca. sa. As the legislature of this state had abolished all pre-existing prison rules, and prescribed the limits of the state as the only prison bounds, Hanna was entitled either to those bounds or to none, unless the foregoing exposition of the act of 1800 be altogether erroneous. For if it be correct, the bounds prescribed by the act of 1822 were the bounds prescribed to the federal court; and if a citizen could not have been imprisoned under ajudgment of a court of the state, and if, asargiied, a prisoner under federal process shall be entitled only to the prison bounds to which he might (at the same time) have been Restricted by the authority of a state court, the consequence would be that Hanna was not entitled to the benefit , of any prison rules. Should the abolition of the ca. sa. produce any such consequence as that last mentioned ? The meaning of the act of 1800 is, that the federal courts, until otherwise declared, shall use state prisons in such condition, with such rules, and under such regulations as they might find them understate authority; and that a person imprisoned under process from a *661 federal court shall be entitled to.the benefit of such prison rules as he would have been entitled to if he could have been imprisoned under process from a slate court, As the general government is dependent on the comity of the states for the use of their prisons, surely it is but reasonable that the benefit be enjoyed according to the will of the states, and under state regulations. I have no right to enquire into the motive of the act enlarging the prison bounds in 1822, The legislature had a right to pass it. The general government has conformed to it: and who. has a right now to arraign its motive or question its validity? If the federal court had not acquiesced in it, then the state might have considered its power of withholding from that court the use of the state prisons, and have acted upon its own judgment of its own rights and obligations. The chief object of the act of 1800 was to prevent any danger of such collision as might have been thus provoked.
But whatever should he the proper construction of the act of 1800, the federal court had competent authority to conform to the act of 1822, and it has done so ; and congress too, knowing all the facts, has approved by acquiesence. It seems to me, therefore, that the jailor had no authority to take any other bond than that which lie did take, and that, consequently, that bond is binding.
If the act of 1800 should be construed to mean that Hanna was entitled to the benefit of the prison ruiefe only when he might have been imprisoned under state process, then, if he could not have been so imprisoned at the date of ids bond, he hacino right to the benefit of any prison bounds. Such a consequence, inevitable from such premises, tends, by its absurdity, to shew that the premises are untrue, and that be was entitled to the prison and prison rules as established by the law of the state at the date of his bond. A ca. sa. could be issued against him, notwithstanding its abolition by the state : he could, therefore, be imprisoned ; and the act of 1800 should not be so construed as to deprive him of the benefit of the prison rules merely because a ca. sa. coulcl not be issued upon a judgment of a state court. That act means, not that he should have no prison *662 rules when, by the laws of the state a ca. sa. could not be issued, but that he should have the benefit of such rules as belong to the jail under the law of the state, and as he would have been entitled to if he could have been imprisoned under state authority. And thus the legislature of 1822 understood the act of 1800; and the federal court seems also to have acted accordingly. I am unwilling to say that all this was wrong, and that the bond is void.
If a state shall act unreasonably or unjustly, congress may interpose and prescribe- other rules for the’ federal courts. But until congress shall so interpose, the state rules should be also the federal rules. And I cannot admit that congress has no power to direct the courts of the United States to conform to the entire process of the states, as it may be whenever process may be issued from the office of a federal court. Such a.doctrine would operate inconveniently and injuriously, and would seem to me to be, inconsistent with the harmony and the genius of an imperium in imperio. In such, a matter I am unwilling to deny to congress the rigid to defer to the wisdom of the states.
Wherefore, it is my opinion, that the judgment of the circuit-court is right, and ought to he aifirme,d.